RECEIVED
IN LAKE CHARLES, LA

JUN - 6 2013

TONY R. MOORE, CLERK
BY _____
    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **SOUTHWEST VETERINARY SERVICES, INC.** | : | **DOCKET NO. 2:12-CV-2281** |
| **VS.** | : | **JUDGE MINALDI** |
| **HARTFORD CASUALTY INSURANCE CO.** | : | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment [Doc. 10], filed by the defendant, Hartford Casualty Insurance Co. ("Hartford"). The plaintiff, Southwest Veterinary Services, Inc. ("Southwest") filed an opposition [Doc. 20], and Harford filed a reply [Doc. 26]. For the foregoing reasons, Harford's Motion for Summary Judgment is GRANTED.

## FACTUAL BACKGROUND

This case arises out of an insurance coverage dispute between Southwest and its insurer, Hartford, for damage sustained by Southwest's veterinary clinic during Hurricane Gustav.[1] Southwest originally filed suit in the Fourteenth Judicial Court of Calcasieu Parish in July 2012, and Harford then timely removed to this court on the basis of diversity jurisdiction, 28 U.S.C. § 1332.[2]

On October 13, 2004, Southwest, acting through of its authorized officer, Dr. Verlin Jones, acquired an insurance policy bearing policy # 83SBA PR2272 ("the Policy"), to insure its veterinary clinic at 419 Shell Beach Drive, Lake Charles, Louisiana (erroneously listed in the

---

[1] *See* Pl.'s Compl., [Doc. 1-5].

[2] Not. of Removal, [Doc. 1].

1

Policy as "419 Shelby Drive").³ Because the veterinary clinic sustained damage during Hurricane Rita in September 2005, Southwest subsequently relocated its clinic to 411 Woodruff Street in Lake Charles, Louisiana.⁴

About two months after the relocation, Dr. Jones asserts that he notified an insurance agent at HUB International (the agent who brokered the Hartford Policy to Southwest) that Hurricane Rita had destroyed the Southwest clinic at 419 Shell Beach Drive, and that Southwest's new mailing address and insured premises address was 411 Woodruff Street, Lake Charles, Louisiana.⁵ Dr. Jones asserts the HUB agent told him HUB would pass on this information to Hartford, so that Hartford could make the appropriate changes to the Policy.⁶ Hartford counters that, based on its records, it was only notified by HUB of a change in *mailing* address for Southwest, and not a change in address of the *insured premises* itself.⁷ A "Policy Change Endorsement" was issued to Southwest on November 9, 2005, reflecting that Hartford had changed the mailing address to 411 Woodruff Street, and that this change was effective starting October 13, 2005.⁸

Following this change in late 2005, Southwest renewed the Policy for a term starting October 13, 2006 and ending October 13, 2007, and renewed it once again for a term starting

---

³ Aff. of Verlin Jones, Ex. B to Pl.'s Opp. to Mot. for Summ. J., [Doc. 20-2], at ¶ 2; *see also* Policy documents for coverage period 10/13/04 to 10/13/2005, Ex. A to Def.'s Mot. for Summ. J., [Doc. 10-2]. As noted above, the policy erroneously lists the address as 419 Shelby Drive (an address that does not exist in Lake Charles). Dr. Jones notes in his affidavit that, while the address was erroneously listed, he did not need to "concern [himself] with the erroneous address" because Hartford's agent had assured him that "the coverage was to apply to Southwest's ongoing place of business." Aff. of Verlin Jones at ¶ 3.

⁴ Aff. of Verlin Jones at ¶ 4.

⁵ *Id.* at ¶¶ 6 – 8.

⁶ *Id.* at ¶ 9.

⁷ Def.'s Statement of Uncontested Material Facts to Mot. for Summ. J., [Doc. 10-8], at ¶¶ 4 – 5.

⁸ *See* Policy Change Endorsement, Ex. C to Def.'s Mot. for Summ. J., [Doc. 10-5].

October 13, 2007 and ending October 13, 2008. Hartford sent renewal reminder documents to Southwest each time before the Policy was to expire. In both sets of documents, the mailing address for the Policy was listed as 411 Woodruff Street, and the insured premises address was listed at 419 Shelby Drive.[9]

On September 1, 2008, Hurricane Gustav struck the Lake Charles area, causing damage to Southwest's clinic at 411 Woodruff Street.[10] Southwest therefore filed claim #CP0009221387 on March 30, 2010 with Hartford, claiming losses sustained from Hurricane Gustav.[11] Hartford denied coverage for Southwest's Gustav claim, however, noting that the Woodruff clinic was not the insured premises listed in the Policy: the Shelby/Shell Beach Drive address was instead.[12]

Southwest then filed suit in July 2012 against Hartford, requesting a total of $73,100.37 to cover losses of pharmaceutical medicine, loss of business income, loss of property, loss of records and papers, and loss of accounts receivable for its property at 411 Woodruff Street, along with bad faith damages and "other damages."[13] Hartford now moves for summary judgment, arguing that because the Policy lists 411 Woodruff Street as the mailing address only and not the insured premises address, it is not responsible for coverage of the Woodruff street location. In the alternative, it argues that Southwest's claims should be dismissed because they were untimely filed.

---

[9] Policy renewal documents for coverage period 10/13/06 to 10/13/07, Ex. 3 to Def.'s Reply to Mot. for Summ. J., [Doc. 24-7], at pp. 1, 3; Policy renewal documents for coverage period 10/13/07 to 10/13/08, Ex. A to Def.'s Mot. for Summ. J., [Doc. 10-2], at pp. 4, 6.

[10] Aff. of Verlin Jones at ¶ 10; Def.'s Statement of Uncontested Material Facts at ¶ 7.

[11] Aff. of Verlin Jones at ¶ 11; Def.'s Statement of Uncontested Material Facts at ¶ 10.

[12] Aff. of Verlin Jones at ¶ 12;

[13] Pl.'s Compl., at ¶ 6.

3

## MOTION FOR SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine dispute of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party…" *Id.*

## LAW AND ANALYSIS

### I. The Terms of the Policy are Clear and Unambiguous

The undersigned will first address whether any ambiguity exists in the terms of the Policy which would entitle Southwest to the damages it seeks. As correctly noted by both parties, insurance contracts like the one in this case are subject to the rules of contract construction found

4

in the Louisiana Civil Code.[14] *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03); 848 So. 2d 577, 580 (citing *Carbon v. Allstate Ins. Co.*, 97-3085 (La. 10/20/98), 719 So. 2d 437, 439; *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-0911 (La. 1/14/94), 630 So. 2d 759, 763). When interpreting an insurance contract, the court must discern the parties' common intent. *Louisiana Ins.*, 630 So. 2d at 763; *see also* La. Civ. Code art. 2045. "The parties' intent, as reflected by the words of the policy, determines the extent of coverage." *Parekh v. Mittadar*, 2011-1201 (La. App. 1 Cir. 7/20/12); 97 So. 3d 433, 437 (citing *Ledbetter v. Concord Gen. Corp.*, 95–0809 (La. 1/6/96), 665 So.2d 1166, 1169, *decree amended*, 95–0809 (La. 4/18/96), 671 So.2d 915).

When the terms of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. Civ. Code art. 2046. "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Cadwallader*, 848 So. 2d at 580 (citations omitted). "An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or to achieve an absurd conclusion." *Parekh*, 97 So. 3d at 437 (citing *Reynolds v. Select Properties, Ltd.*, 93–1480 (La.4/11/94), 634 So.2d 1180, 1183).

---

[14] Because jurisdiction is based on diversity, Louisiana law applies to the substantive issues before the court. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, the court must rely on Louisiana civil codes and statutes, along with Louisiana jurisprudence, doctrine, conventional usages, and equity, in making its decision. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 546 (5th Cir. 2004). To make an 'Erie guess' on an issue of Louisiana law, the Court must "employ the appropriate Louisiana methodology" to decide the issue the way that it believes the Supreme Court of Louisiana would decide it. *Id.* (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 197 (5th Cir.2003)).

Turning to the Policy language itself, at the time of Southwest's loss (September 2008), the Policy documents clearly provide that Southwest's mailing address was 411 Woodruff Street, and that the insured premises address is 419 Shelby Drive.[15] This is further reflected in the Policy Change Endorsement, which showed that Southwest's *mailing* address had been changed to 411 Woodruff Street.[16] The document is silent on whether the insured premises address had also been changed.[17]

While the plaintiffs argue that the "Coverages Extensions" provision in the Policy could be interpreted to extend coverage to any new business premises Southwest might acquire (namely, the 411 Woodruff Street location), Hartford correctly notes that the "Coverages Extensions" section further provides, in relevant part:

> SPECIAL PROPERY COVERAGE FORM
>
> A. Covered Property
>
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations (also called described premises in this policy) caused by or resulting from any Covered Cause of Loss.
>
> > 6. Coverage Extensions
> >
> > Except as otherwise provided, the following Extensions apply to property located in or on the building at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises.
> >
> > In addition to the Limits of Insurance, you may extend the insurance provided by this policy as follows:
> >
> > > b. Newly Acquired or Constructed Property.

---

[15] Policy renewal documents for coverage period 10/13/07 to 10/13/08 at pp. 4, 6

[16] *See* Policy Change Endorsement, Ex. C to Def.'s Mot. for Summ. J., [Doc. 10-5].

[17] *See id.*

> (2) You may extend the insurance that applies to Business Personal Property to apply to that property at any premises you acquire. The most we will pay for loss or damage under this Extension is $250,000 at each premises.
>
> (3) Insurance under this Extension for each newly acquired or constructed property will end when any of the following first occurs:
>
> **(a) This policy expires;**
>
> **(b) 90 days expire after you acquire or begin to construct the property, or**
>
> **(c) You report values to us.**
>
> We will charge you additional premium for values reported from the day construction begins or you acquire the property.[18]

Because Southwest moved to the 411 Woodruff Street location sometime in the 2005-2006 insurance term, the coverage extension on the new property would last until the earlier of 90 days after acquisition of the Woodruff property or the end of the 2005-2006 coverage period (as Southwest did not report their loss until 2010, this could not under any circumstances be considered the earliest occurrence that would end the coverage extension period). Because Southwest did not suffer a loss to its Woodruff Street clinic until September 2008, the clear and unambiguous terms of the Policy indicate that the newly acquired property coverage extension would not apply to the loss sustained at that location.

### II. The Parties Have Provided Insufficient Evidence to Indicate whether there was a "Mutual Mistake" between Hartford and Southwest, Allowing Reformation of the Contract

Southwest nonetheless argues that it was Hartford (through its "agent," HUB) and Southwest's intent to instead change the insured premises address. To prove this, Southwest presents parol evidence in the form of an affidavit from Dr. Jones, in which Dr. Jones notes that

---

[18] Policy documents for coverage period 10/13/04 to 10/13/2005 at pp. 19, 26 (emphasis added).

7

he spoke with an agent at HUB and was assured that the insured premises address would be changed. Essentially, Southwest seeks to reform the contract to correct the mutual error of the parties.

According to Louisiana's Civil Law Treatise on Insurance Law and Practice,

> [I]nsurance policies may be reformed if, through mutual error or fraud, the policy as issued does not express the agreement of the parties. In the absence of fraud, the party seeking reformation has the burden of proving a mutual error in the written policy. A unilateral misunderstanding is not sufficient. Commonly, the mutual error asserted relates not to the printed form of the policy but rather to the persons insured, the property covered, the amount of coverage or the type of coverage purchased . . .
>
> . . . Parol evidence is admissible to show mutual error even though the express terms of the policy are not ambiguous. In *Ferguson v. Belcher & Son*, the supreme court indicated that, "(t)he burden is on the one seeking the reformation to prove the error, and he must carry said burden by clear, and the strongest possible proof." This requirement was modified by the supreme court in *Bonadona v. Guccione*, which held that clear and convincing evidence of mutual mistake was necessary only when a party sought to prove that the insurer had insured a substantially different and greater risk than that expressed by the written policy. On the other hand, only the normal burden of proof by a preponderance of the evidence was required to reform a policy in a manner that did not substantially affect the risk assumed by the insurer. For example, clear and convincing proof of mutual error would be necessary to delete an express coverage exclusion, but only a preponderance of the evidence would be required to establish mutual error as to the identity of the named insured. Finally, an action for reformation can be, and usually is, brought after loss.

15 La. Civ. L. Treatise, Insurance Law & Practice § 1:5 (4th ed.)

Further, "[i]f the insurance agent knows the true intention of the policyholder as to the coverage desired, the insurance company is bound by the agent's knowledge and the erroneously issued policy will be reformed to conform to the original intention." *Tillman v. USAgencies Cas. Ins. Co.*, 46,173 (La. App. 2 Cir. 3/2/11); 58 So.3d 1009, 1013 (citing *Herbert v. Breaux*, 285 So. 2d 829, 830 – 31 (La. App. 1 Cir. 1973).

At the outset, the undersigned notes that Southwest has made the interesting choice to not join HUB as a defendant in this case. Thus, in order to find Hartford liable, Southwest first makes the argument that HUB was an agent of Hartford, and thus any knowledge HUB had about Southwest's intent to change the insured premises address is imputed to Hartford. Accordingly, Southwest and Hartford (acting through HUB) operated under the mutual mistake that the Policy would be changed to reflect that 411 Woodruff was the insured premises. Hartford counters that HUB is an independent insurance broker, and thus is the agent of the insured, not the insurer, indicating that any mistakes made by HUB cannot be imputed to Hartford. Without a mistake on Hartford's part, therefore, a reformation action against Hartford would be unavailable.

While the distinction between insurance broker versus insurance agent may not seem to make a difference for this mutual mistake inquiry at first glance, one of our sister circuits, addressing a very similar fact pattern, found that this distinction is of utmost importance. In *Secura Insurance Company v. Saunders*, 227 F.3d 1077 (8th Cir. 2000), insureds, through their insurance broker, applied to Secura Insurance Company ("Secura") for a homeowner's policy for their home. *Id.* at 1079. The insureds requested that their broker extend liability coverage to two of their rental properties. *Id.* The policy application required a description for the rental properties, but the broker did not include this description in the application, and thus Secura did not issue coverage for the two rental properties. *Id.* After this, a guest at one of the insureds' rental properties injured himself, and Secura subsequently filed a declaratory action, seeking declaratory judgment that the insureds' policy did not cover the loss. *Id.* At the district court level, the court found that because the insurance broker was the agent of the insureds instead of the insurer (Secura), the broker's mistaken failure to include the property description for the

9

rental property could not be imputed to Secura. *Id.* Thus, the insureds could not show a mutual mistake between themselves and Secura allowing reformation of the contract. *See id.*

On appeal, the Eighth Circuit affirmed. The court noted that typically, under Missouri law, an insurance broker is the agent of the person who employs him. *Id.* at 1080. Analyzing the evidence presented by the parties, the Eighth Circuit affirmed the district court's finding that the insurance broker was acting as the agent of the insureds. *Id.* As such, the insureds could not show that Secura itself had made a mistake, requiring reformation of the contract. *See id.*

Case law in this district reflects the same maxims found in *Secura*. As aptly summarized by Magistrate Judge Hanna in *Flex Energy, LLC v. St. Paul Surplus Lines Co.*, No. 6:09-cv-1815, 2011 WL 2434095 (W.D. La., June 13, 2011):

> Under Louisiana law, an insurance broker is generally deemed to be the agent of the insured rather than the insurer." But that is not a hard and fast rule. "Whether a broker in any particular transaction acts as the agent of the insurer or insured is a question of fact dependent on the particular circumstances of the case." An agency relationship cannot be presumed; instead, facts must exist that support a reasonable inference that an agency relationship has been entered into.
>
> An agent is one who acts for or in place of another by authority from the latter. "As between principal and agent the limit of the agent's authority to bind the principal is governed by the agent's actual authority." The Fifth Circuit has broadly stated that a broker who solicits business for more than one insurer, has no power to bind the insurer without permission, or who is asked by the client to procure coverage wherever possible at the best price, is not an agent of the insurer, even if he uses application forms or advertising decals with the insurer's name. But the Louisiana Supreme Court has determined that "[a] broker who procures insurance which is accepted and issued by an insurance company pursuant to application forms furnished to the broker by the company is considered the agent of such company in the issuance of the policy." The jurisprudence is also clear that an agreement between an insurer and a broker is not necessarily dispositive of the issue of whether an agency relationship exists between them. This is only one factor to be considered. Furthermore, "simply because a person sells insurance for more than one company does not preclude him from being an agent of all, or any, of them." One Louisiana court identified five factors relevant to determining whether a broker was an insurer's agent: (1) whether the agent had a direct relationship with the insurer; (2) whether the agent

was the insurer's agent in fact; (3) whether there was an ongoing, prior relationship between the agent and the insurer; (4) whether either the agent or the insurer had control over the other; (5) whether the insurer appointed the agent as its agent. Therefore, under Louisiana law, a broker can be an agent of an insurer from whom he secures a policy, if the facts particular to the relationship between the broker and the insurer support that conclusion.

*Id.* at *6.

Turning to the evidence before the court, the undersigned is presented with far less information than the *Secura* court[19] or the *Flex Energy* court[20] on the issue of whether HUB is an independent insurance broker or else an insurance agent for Hartford. Southwest alleges that the reason it cannot provide evidence on the relationship between HUB and Hartford is because no one from HUB has been deposed yet. Hartford counters that the reason no one at HUB has been deposed is because Southwest has never attempted to conduct discovery. Further, in support of its argument that HUB is an independent insurance broker, Hartford attaches a printout from HUB's website, noting that this printout shows that HUB is an international, independent broker "capable of issuing policies from numerous insurers."[21] On Southwest's side, the evidence in support of a finding that HUB was Hartford's agent appears to consist solely of the fact that HUB was the middleman between Hartford and Southwest when Southwest first selected its

---

[19] In *Secura*, the court found that: "[The broker's] ability to change insurers and to shop around for the best terms, the language in the contract between Secura and [the broker], and the fact that [the broker] previously obtained coverage for the property in question through a different insurer all weigh against a finding that he was Secura's agent." *Secura*, 227 F.3d at 1080 – 81.

[20] In *Flex Energy*, the court found ample evidence that the insurance broker was an agent of the insurance company: (1) a contractual relationship existed between the broker and the insurance company, and that the broker had underwriting authority for the insurance company; (2) the broker negotiated, placed, and underwrote the policy issued in *Flex Energy*; and, (3) after the coverage dispute in *Flex Energy*, the claim was communicated to the broker instead of the insurance company. *Flex Energy*, 2011 WL 2434095 at *7.

[21] HUB Website Printout, Ex. A to Def.'s Reply to Mot. for Summ. J., [Doc. 26-5].

Policy and then made a change to the Policy. When Southwest made its Hurricane Gustav claim, however, it dealt directly with Hartford.[22]

Ultimately, based on this dearth of evidence, the undersigned cannot definitively resolve whether HUB was an agent of Hartford. Either party could have easily met their summary judgment burden on this issue by including an affidavit from officials at either Hartford or HUB, indicating the relationship between the two companies, or the contract, if any, between HUB and Hartford, but they did not. Without this key information, the court is unable to ascertain whether there was a mutual mistake between Southwest and Hartford.

### III. Assuming *Arguendo* that HUB's Actions are Imputed to Hartford, Southwest had Constructive Notice of the Errors in the Policy through the Policy Renewal Documents as Early as October 2006, and thus its Claims Must Still be Dismissed as Perempted

Hartford argues that, even if Hartford and HUB are considered one and the same, Southwest's claim still fails because it had constructive notice of the errors in the Policy. It notes that, over the span of several years, Southwest received a Policy Change Endorsement and two Policy renewal documents that all clearly showed the 419 Shelby address as the insured premises.

Assuming *arguendo* that HUB's actions were imputed to Hartford, and Hartford was therefore Southwest's agent, Hartford had a duty, as an insurance agent, to "supply [Southwest] with correct information, and . . . may be liable for negligent misrepresentation [by] provid[ing] incorrect information," causing damage to Southwest. *Chagnard v. Cambre*, No. 07-1754, 06-2613, 2007 WL 2229296, *2 (E.D. La., Aug. 1, 2007) (citing *Venture Assocs. Inc. of La. v. Trans. Underwriters of La.*, 93-539 (La. App. 4 Cir. 3/2/94) 634 So.2d 4, 6-7).

---

[22] Letter from Dr. Jones to Hartford, Att. 4 to Def.'s Reply to Mot. for Summ. J., [Doc. 26-4], at p. 1.

A claim against an insurance agent for supplying incorrect information will be perempted[23] if it is not brought within the time period provided in La. Rev. Stat. § 9:5606, however:

> A. No action for damages against any insurance agent ... whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide insurance services shall be brought unless filed ... within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered. However, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect. . . .
>
> D. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.

The one year preemptive period begins to run from the date that the plaintiff discovered or should have discovered the act, omission, or neglect. *Huffman v. Goodman,* 34,361, (La.App. 2 Cir. 4/4/01), 784 So.2d 718, 725. "[P]eremption ... in insurance malpractice cases, begins to run from the date of discovery, not the date that damages begin to accrue." *Burk Prop. Investments, LLC v. Alliance Ins. Agency Servs., Inc.*, 2008-0489 (La. App. 4 Cir. 9/10/08), 993 So. 2d 810, 814.

"Under Louisiana law, an insured has a duty to read his insurance policy and know its provisions." *White v. Allstate Ins. Co.*, 513 F.Supp. 2d 674, 682 (E.D. La. 2007) (citing *Motor Ins. Co. v. Bud's Boat Rental*, 917 F.2d 199, 205(5th Cir. 1990). If an insured has constructive notice that its insurance policy may not provide the coverage its insurance agent promised it

---

[23] The court notes that, strangely, Hartford does not explicitly argue that peremption applies, although the cases it cites in the relevant portion of its reply brief all stand for the premise that an insured's claim will be extinguished through preemption if it does timely file after receiving constructive notice that the insurance agent had supplied incorrect information. At any rate, La. Civ. Code art. 3460 provides that a court may bring up the issue of peremption *sua sponte*.

would, an insured's resulting claim against its insurance agent and/or insurance company may be perempted if not brought within the time period provided in § 9:5606. For example, in *Burk Property Investments, LLC v. Alliance Insurance Agency Services*, an insured filed suit against its insurance agent and insurance company after the insurance company denied its flood damage claim, arguing that the agent had negligently represented to the insured that its insurance policy included flood coverage. *Burk*, 993 So. 2d at 811. At the trial court level, the court found that the insured's claim was perempted because the insured had constructive notice as of June 2005 that it did not have flood insurance, and it did not file suit until August 2006. *Id.* at 812. On appeal, the Louisiana Fourth Circuit affirmed, finding that the insurance applications signed by the insured in June 2005 showed that there was no flood insurance. *Id.* at 814. As such, the peremptive period began to run in June 2005, and any cause of action against the insurance company and insurance agent accordingly had to be filed within the time window of June 2005 to June 2006. *Id.* at 815.

In a similar case, *Jambon v. State Farm Fire and Casualty Co.*, 07-925 (La. App. 5 Cir. 3/11/08), 982 So. 2d 131, insureds sued their insurance agent and insurance company after they sustained flood damage from Hurricane Katrina. *Id.* at 132. The insureds had previously acquired a homeowner's insurance policy, which provided coverage for the building but not the contents inside. *Id.* The insurance agent assured the insureds that, once they furnished their home, the insurance policy would be changed to reflect that the contents were insured as well. *Id.* Despite this, the policy was never actually amended, and a renewal certificate, sent a year after the insured initially acquired the insurance, reflected that the policy did not include coverage for the contents of the home. *Id.* The trial court found that, at the very latest, the insureds had constructive notice that their policy did not include contents coverage when they

received and paid the renewal of the insurance in July 2005. *Id.* at 133. On appeal, the Louisiana Fifth Circuit affirmed, finding that the insureds had constructive notice at the time they received their renewal documents in July 2005. *Id.* at 133 – 34. Because the insureds did not file suit until August 15, 2006, therefore, their claims were perempted.

Federal courts in Louisiana, construing Louisiana insurance law, have similarly found that an insured's claim against an insurance agent for negligently representing the extent of an insurance policy's coverage will be perempted if the insured has constructive knowledge of the error and does not file suit within the time period set forth in § 9:5606. For example, in *Campbell v. Stone Ins., Inc.*, 509 F.3d 665 (5th Cir. 2007), the Fifth Circuit affirmed the district court's finding that because "the [insureds] read the cover letter and policy, and signed the flood rejection form, they had constructive knowledge of the contents of the policy at that time. Any misrepresentation from the agent stating that the policy included flood coverage would have contradicted the cover letter and the flood rejection form, which would have put the [insureds] on constructive notice of the misrepresentation." *Id.* at 671. Because the date that the insureds had constructive notice of the misrepresentation was over a year before they filed suit, the Fifth Circuit accordingly affirmed the district court's finding that the insured's claims were perempted. *Id.*; *see also Ben Bros., LLC v. Fidelity Nat'l Prop. & Cas.*, No. 06-0548C/06-6462, 2007 WL 3488205, *4 (E.D. La., Nov. 13, 2007) ("[S]everal judges of this Court have held that an insured's knowledge that the terms of a policy directly contradicts a representation or statement made by the insurance agent who sold the policy is sufficient to excite the attention of the victim and put her on guard. As such, an insured should have known of an insurance agent's neglect as of the date of issuance of the policy."); *Dobson v. Allstate Ins. Co.*, 2006 WL 2078423, *9 (E.D .La. July 21, 2006) ("Knowledge of policy terms that directly contradict a

15

statement by the agent who sold the policy is sufficient to excite attention and put the insured on guard. Thus, even if the Court were to consider plaintiffs' assertion that [the insurance agent] negligently misrepresented the terms of their coverage to them in October 2004, they knew or should have known of his wrongful conduct as of that time, as they had a copy of their policy in hand."); *but see White*, 513 F.Supp. 2d at 682 (finding that there was insufficient information to indicate whether insureds had constructive notice that their insurance agent had erroneously told them he would increase their insurance coverage limits, where the court did not have information on whether the insureds had received documents showing their coverage limits had not been changed).

Applying the reasoning to this case, Hartford argues that Southwest had multiple chances to detect that the insured premises address was incorrectly listed and correct this error. Hartford has presented uncontested evidence that, after Southwest contacted the HUB agent and asked them to change the insured premises' address in November 2005, Southwest received policy renewal documents on or around October 2006 and again in October 2007 that reflected the insured premises' address was still 419 Shelby Drive. As such, Southwest had constructive notice as early as October 2006 that the HUB agent had made a mistake in changing the Policy. By not filing suit until July 2012, Southwest's claim is clearly perempted.[24]

### IV. Southwest's Bad Faith Claims must be Dismissed

Finally, because the court has found that Southwest does not have a valid underlying claim for insurance coverage, dismissal of Southwest's bad faith claims is also proper. *See Clausen v. Fidelity and Deposit Co.*, 95-0504 (La. App. 1 Cir. 8/4/95); 660 So. 2d 83, *writ denied*, 666 So.2d 320 (La.1986) (holding that statutory penalties and fees

---

[24] Because the court has found that Southwest's claim is perempted, it will not address Hartford's timeliness argument.

for bad faith claims handling are unavailable in cases where there is no underlying cause of action for failure to pay a legitimate claim).

## CONCLUSION

In conclusion, even assuming *arguendo* that HUB's actions could be imputed to Hartford, Southwest's suit is perempted. Accordingly, the court will grant summary judgment in favor of Hartford, dismissing Southwest's claims with prejudice.

Lake Charles, Louisiana, this 5 day of June 2013.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE